Good morning, Your Honors. My name is Sharon McCauley, and I represent the O'Quinn legal entities in this appeal. We are asking the Court to reverse the summary judgment that was entered by Judge Hoyt. Specifically, we want you to reverse the judgment that he entered in favor of Lexington, our professional liability excess insurance carrier. We're going to be speaking a fair amount about coverage questions today, but before we do that, if the Court would indulge me a moment, because this was a summary judgment proceeding, I would like to point out two overarching errors that the District Court committed in applying the procedure. Because the Court knows under Rule 56, we as the non-movement should have been entitled to all presumptions, everything should have leaned in favor of us as the non-movement. But if the Court would first look to footnote 3 on Record 13-617, that's page 3 of Judge Hoyt's opinion, he tells us the standard overview that he actually applied. He pulled it from CBN v. Delgado, a Texas 2002 decision, and he said he was going to treat the arbitration award underlying this insurance dispute as a final judgment. He then said he was going to indulge all presumptions in favor of that arbitration award. That is an incorrect standard. You told us that was an incorrect standard in National Union Fire v. Puget. That was a 5th Circuit 2008 case. You explained to us... I'm confused. Are you challenging the arbitration award? I'm not challenging the arbitration award, Your Honor, because the arbitration award has been vacated. That was my other procedural problem with the way Judge Hoyt treated this as a 12 corners review. So I'm not challenging it. We settled the arbitration award. If the Court will note at pages 7894-7900 of this record, the arbitration decisions, there were four separate opinions. Those were all vacated, not by a district court, but by the arbitration panel itself. Those arbitration opinions went away. Nevertheless, Lexington relies exclusively on the arbitration panel decision for its arguments before Judge Hoyt that there was a 12 corners review that needed to be conducted and that the arbitration panel had already found, applied the terms of the policy against the OQIN legal entities. It's just not what happened. So that takes me back to your Puget decision. What you told us in Puget was that you can't take the underlying case, you can't take jury findings or even arbitration findings in the underlying case and extrapolate or superimpose them on a bargain for insurance policy with the defendant. You simply can't do that. In the Puget case, for example, what you were looking at was jury findings against a defendant for DTPA and specifically a finding of deliberate. And you said that that deliberate could not be superimposed upon a policy that did not provide coverage for intentional acts if the defendant intended it. The words are close, but they're not close enough. And that's what we were explaining to Judge Hoyt when we said that the standard of review, you have to look at all of the evidence. So that's the reason context is... Are you saying there was no fee forfeiture? I'm not saying there was not a fee forfeiture. The arbitration panel ordered $25 million in fee forfeiture and that was part of the settlement. And that's under Borough v. RC? That's correct. That is correct. The arbitration panel also entered a damage award for breach of contract. There was an award for actual damages. Okay, how much was the fee forfeiture? $25 million. So you're not disputing the amount either? I'm not disputing the amount that the arbitration panel found. That is absolutely correct. Nor are we disputing that the arbitration panel found breach of contract damages for $10 million in actual damages, $2.5 million in Chapter 38 attorney's fees, and another sum of $4 million for interest. So does your point that all of that would have been subject to being challenged by looking at all the evidence? Had you seen fit to do so? I want to be sure that I'm understanding your question. Well, you're saying that it's necessary to look at the underlying facts, whether it's a jury verdict, whether it's a panel of arbitrators. So are you saying any of the results from the arbitration are fair game in what we're looking at now, but you've only challenged some part of it and not others? What I'm really suggesting, Your Honor, is that the arbitration panel opinions cannot be set next to the pleadings in this case and the insurance policy and determine... I guess it would help us if you tell us specifically what you are challenging. I mean, if you're conceding that the amounts that the arbitrators awarded are the amounts and it's for what they said it was... I'm probably misleading the court. We are not challenging the numbers. We're not challenging the breach of contract was found and the breach of fiduciary duty was found. These are the wrongs that form the basis of the wrongful acts that we're asking for coverage for. What we are challenging is Lexington's characterization, because that's what they have to do. They have to characterize those arbitration panel opinions. They have to characterize them in such a way to import them into the policy terms. One of the best examples I can give you is under their argument on fortuity. They have to establish... They'll say, we have to establish. What the court needed to find was that as a matter of law, the OQIN legal entities knew or should have known that they were incurring a loss to the claimants. They don't have the panel finding that because the panel didn't have that question before that. Can we talk about the policy terms? Absolutely. The policy terms, the most important policy term for us at the moment is the duty to defend, because that was the one that Judge Hoyt never even talked about in the decision below. It was one that was for $5 million. It's also prejudgment interest that does not need to travel through a covered loss. Let me say that differently. The prejudgment interest under this policy is covered under the defense costs. It is a defined term as judgment that is accruing after... An interest that is accruing after a judgment. What Lexington wants to convince you and what they argued to Judge Hoyt is that the only way we could get prejudgment interest was if the judgment below that the interest was accruing on was actually a covered loss. That's just not what the policy says. What amount of defense costs do you say that you're entitled to recover? $5 million. Plus what? That's it? You just want $5 million? $5 million in post-judgment interest that was part of the $46.5 million settlement in the underlying Woods case. So you're saying $5 million is prejudgment interest? That's correct. We also are making the claim for the forfeiture amount on breach of fiduciary duty. That is a covered loss. We are also making a claim for the breach of contract damages, all of them, the actual damages, the interest, and the Chapter 38 fees. But you recognize, I assume, that the excess limits are $10 million. That's right. Absolutely. So we want $10 million, and if this court believes, for example, that the breach of contract damages are not excluded under any of the myriad policy language that Lexington relies upon, then we are entitled to their entire $10 million excess coverage. So you don't have to find in favor of every single one of the elements of damage that we're asking for in order for them to need to pay $10 million in coverage. But that's what Lexington was trying to convince the district court, is that you don't view it as component part damages. In fact, they call it earmarking. They say that we are trying to segregate between those damages. And what do you say the $10 million of breach of contract damages are? Is that for the expenses, the breast implant general expenses? That's correct. The actual damages that the panel awarded, the panel looked at the to assess the expenses pro rata so that, for example, the initial plaintiff that went to trial didn't have to pay for all of those expenses. So that general methodology Let me ask you a question. Let's assume that a client pays Vincent Elkins their monthly or yearly bill, pays it and then goes back in and says, wait a minute, you way overcharged me for copying costs. And Vincent Elkins says, see me. The client gets a judgment for excess copying costs. Is Vincent Elkins entitled under this policy to get those costs back from the insurance carrier? I think that would be a tough question under the professional legal services provisions of the policy. I think that would be a difficult question if it was just a question of you promised me that you were going to charge $0.10 for a copy. And in fact, you charged me $0.12 for a copy because that is a rote clerical accounting issue. And that would probably fall. No, they just said we'll charge you a reasonable amount. And they charge $1.50 per page instead of $0.10. Or let's make it, let's leave it at that. I mean, would that, could you get coverage from your insurance carrier for that? I'm not sure that you could, Judge, but I think the question would be whether or not there was any exercise of professional legal judgment. All right, let's change the hypothetical. Let's say that you billed them for 5,000 hours and they come back and say, look, we've interviewed your lawyers, your paralegals, and you really only spent 2,000 hours. You padded your hours. And they sue and they recover. Can you get, is your insurance company going to pay that? Again, on this policy language that we have here, the defined terms, I think that would be a closer question. Unless there was professional legal judgment that was involved. Because of the policy language that we see here, for example, Lexington is citing to the Gregg and Valby case, and they're trying to characterize billing disputes as those things that do not fall within professional legal service. What do you think the loss definition says? We're not going to reimburse you. Loss does not include reimbursement of legal fees, costs, or expenses. What does that mean? As I stand here, Judge, I'm not sure that I know exactly what it means. I do know better what it does not mean, and it does not mean the return of legal fees. Well, do you need to tell me what it does mean, because we've been talking about it. I'll do my best. It's in the definition of loss, so we have to give it some meaning. I'd like your best judgment. It means something. I will do my best. And my best is based in this record. The OQIN legal entities were, in addition to the sums that I've already talked about, they were assessed costs associated with the Woods plaintiff's arbitration in the amount of $500,000. The OQIN legal entities determined that they felt that that fit within the definition of a reimbursement of a cost, and that, therefore, is not the subject of this appeal. But when the arbitration panel said return, they said it several times when it came to the actual damages, return. And when we look at the policy and the- I thought you said we can't rely on the arbitration panel for wording. I don't think you should, but if they're going to, we're going to go with the rules of the road. If we don't know what the underlying activity- Well, we know that you said that the arbitration panel said you have a certain amount of money, the breast implant, general expenses. We're all agreed on that, the amount. But we're not agreed on how-we're not going to look at how the arbitrators characterized it, right? Or are we? No, you do not. Not according to your Puget decision, you don't, because they weren't looking at the question whether or not there were professional legal services as defined, and they weren't looking at whether or not they were arising from, which is what the Gregg and Valby case neglected to discuss, which the Norman and Shaw later discussed, is that when you have arising from legal services and activities, which is the definition that we have here, Judge Hoyt really should have looked to the record in this case, the summary judgment evidence, which he completely ignored, to determine whether or not that fell within the terms of the policy. But instead, that footnote tells us that he felt that he had to do a 12-corners review and was bound by findings of the arbitration panel that they didn't have to make. That's arbitration dicta under your Southwestern Bell v. PUC decision. So this Court needs to decide for itself, but given the facts, it apparently undisputed, that there were general expenses that were awarded to the breast implant plaintiffs. No, Your Honor, that's actually my point. I think the facts are very disputed. I think if this Court looked, for example, to the testimony of Mr. Laminack on 11785, you would find very important factual testimony about whether or not these policy provisions are implicated. He said there was no profit, for example. We also had Judge Enid testify. Is it an expense? Is it an expense? Does it come within loss? What is an expense? Your Honor, it may be within expense, but the question is whether or not it was a professional legal service. And when the Woods plaintiffs charged the O'Quinn legal entities with violating the Texas Rules of Disciplinary Procedure, we know that we were exercising professional judgment. We also know that when Judge Enoch said to have done it the opposite would have been unfair, we know that when Mr. Blizzard, another attorney, testified and said that this is the methodology that is routinely used, then we know that Judge Hoyt had before him testimony that he should have viewed in the light most favorable to the O'Quinn legal entities. He wasn't bound by findings that had been vacated. And even if they hadn't been vacated, he wasn't bound. Well, I'm not sure I understand how fairness and that this is the way it's done changes the nature of what the payments were. They were still expenses that the O'Quinn firm had withheld from the fees that were given back by the arbitration panel. You know, you could argue that they shouldn't have done that, but I'm not sure how that helps us. Saying it's unfair changes its character. I see that my time is about to expire. May I answer your question? Sure. The reason that the testimony about whether or not it was fair or unfair to use pro rata is critical in this case is because it falls into a category of whether or not we knew or should have known under the fortuity doctrine. It also falls into the category of whether or not we received a profit or advantage, which would cause us not to be covered. There was no profit. We were doing something that was fair, spreading them out. This didn't go to the pocket of the O'Quinn legal entities. It was a methodology based upon legal expertise about how to handle mass tort billing expenses. And so all of these policy provisions that we are discussing, they do turn on. They may be plain language. Some of them are actually ambiguous, but they may be plain language as a matter of law looking at the face of the contract. But the application to the facts of this case, Judge Hoyt was not bound by what the arbitrators had said. The arbitrators were not litigating the terms of this policy. We bargained for the terms of this policy. And we bargained hard for them. For example, the post-judgment interest that I was referring to before, that was originally in the policy as it had to be a covered loss for post-judgment interest to be covered. We bargained for that B-1 provision to be out and an endorsement for it to be substituted in its place. Coverage is not required for post-judgment interest. So it was very important that Judge Hoyt was confused into believing that he had to apply the four corners of that arbitration decision as though it was jury findings that were directly on point. Your Puget decision says that that is error. And that is the reason that this court should reverse this summary judgment and remand it back to Judge Hoyt to perform a proper analysis under Rule 56. You've saved time for battle. Thank you. Good morning. May it please the Court. Mike Czojki along with Elizabeth Rivers and Tom Wright here on behalf of Lexington Insurance Company. There are multiple independent paths by which this court can affirm the district court's judgment. But let me start off by talking about what seems to be the main argument that I heard from opposing counsel which is an argument that was never raised in any of the briefs in this point. The Puget case, which they rely very heavily on, is nowhere cited in any of the briefs. Both parties submitted the arbitration awards as exhibits for the summary judgment proceedings. I believe that's true. At a minimum, the Oakwood firm certainly never objected to the arbitration awards being submitted for consideration by the court with respect to the underlying facts. And when you're analyzing the duty to indemnify, one of the things you have to look at are what are the underlying facts and the underlying judgment. Well, if all three of you were looking closely at footnote 3 in the last 15 minutes, do you agree with the characterization that she gives to what Judge Hoyt says he was doing in that footnote 3? I believe what he was doing was he was looking at both parties asked him to do was to look at the arbitration awards. Both parties relied on those arbitration awards to say this is what the underlying facts are and this is what sets up the availability of a duty to indemnify in this case. There certainly was never any objection or argument made in the district court or in the briefing in this court to suggest that there was anything procedurally improper about what Judge Hoyt did. They filed a motion to alter and amend the judgment, never raised this point there. They never raised it in any of their briefings. I understand her argument to be is that whatever the arbitrator said, unless they were dealing with the insurance policy terms, you have to do some extrapolation from them. They would not have decided the insurance policy issues. But insofar as there were back findings by the arbitration panel, it seems to me that is what you live with in this case. It's just whether they completely fit with what we need to figure out on coverage. Is that a fair assessment of how the arbitrator panel decision fits in? I believe so, Your Honor, and again, both parties relied on those findings that the arbitration panel made in making their arguments as to summary judgment. OQIN relies on certain findings. We rely on certain findings, and that's the basis on which the court ultimately makes its determination. But it doesn't tell you whether they're professional services. It doesn't tell you whether they're anything else. Well, that's exactly right, and let me start by talking about professional legal services because I think that's the first path by which this court can clearly affirm the district court's judgment. The billing practices at issue here, the practice by the OQIN firm to take money out of settlements that did not belong to them did not involve any legal skill or knowledge, and the Gregg and Volpe case and the Atlantic Lloyds case out of the Texas State Court of Appeals both hold that and rely upon the fact that not all actions by an attorney are professional legal services. It has to involve the, you know, Gregg and Volpe said that it's those acts that use the inherent skills that are typified by that profession, not all acts associated with the profession. And the act of billing a client does not involve any professional legal skills, does not involve any legal knowledge to make a determination that we're going to withhold from a settlement a certain percentage of that settlement and not give it to you after it's been given to us by the defendants. Why isn't that a breach of fiduciary duty, though?  Aren't breaches of fiduciary duties covered? I'm sorry, Your Honor? Aren't breaches of fiduciary duty covered? Well, again, Your Honor, breaches of fiduciary duty are covered, but if you look at the Allstate Lloyds case, and that's a case where, again, it involved a solicitation letter that was sent by the lawyer, and the question was whether that involved legal services. And one of the arguments that was made in that case was that, well, it's regulated by the rules of professional conduct, and so, therefore, it's legal skills. But it's not, but the court held in that case that it did not involve inherently the legal knowledge and legal skill of an attorney, and so, therefore, it didn't fall within the definition of professional legal services. And I want to talk about. Why don't you cover a breach of fiduciary obligation? Your Honor, we do cover breaches of fiduciary obligations when they are made in the rendition of professional legal services. But in this case, any breach of fiduciary duty was not made in the rendition of legal services. A lawyer can owe fiduciary duties and duties of care that don't necessarily can still be breached even when the lawyer is not engaging in professional legal services, and that's what happened here, and that's what the district court held in the Gregg and Volpe case, is that billing services, just because they're performed by a lawyer, are not professional legal services. And the argument that was made that somehow the language about arising from or arising out of means that it's broader, and that is, in fact, what the court used to distinguish Gregg and Volpe in the Schauman case and the Shor-Chan case, but that's not the language that we have in our policy. Our policy says that it will pay for a loss arising from a claim. So there's your arising from language. Loss has to arise from a claim, but the claim has to be for a wrongful act committed by the insured in the rendering or failure to render professional legal services. There's no arising out of the professional legal services. The claim has to be for a wrongful act in the rendering or failing to render professional legal services. So therefore, we fall squarely within Gregg and Volpe. We fall squarely within the Atlantic Lloyds case, and this is not professional legal services. The second point, the second path on which this court can affirm the district court's judgment has to do with the fact that the claim does not fall within the policy's definition of loss. And there are a few other paths that we go down to reach that point, but the main one I want to talk about is the one that this court recognized in the NRA Trans-Texas Gas Court case, which is that the policy says that the loss does not include matters which may be deemed uninsurable under the law pursuant to which this policy is construed. Everybody agrees that this policy is construed under Texas law. And what this court held in Trans-Texas is that when a claim is restitutionary in nature, then that is uninsurable as a matter of law. And it makes sense under the context of this policy and otherwise that when you have a situation here where the Oakwind firm improperly billed its clients and so they took money that did not belong to them. That's a statement made by the arbitration panel in its award, is that the Oakwind firm took money that did not belong to them, and then they were forced to return it. And as this court held in Trans-Texas, relying upon both the state intermediate appellate court's decision in Nortex and in the Seventh Circuit's decision in Level 3 Communications, which gives a very excellent discussion about this fact, is that you cannot insure for a loss in the abstract, or in the colloquial sense it can be a loss, but it's not a loss if all you did was take somebody's money and you're forced to give it back. That is not the type of claim that is covered by this policy, nor should it be covered by this policy, because it is a matter that should be uninsurable, and that's because there's countless harms and wrongs that can happen if we're allowing parties to take money and then be forced to return it and then trying to pawn that off on their insurance company. The policy here expressly says that it does not cover that as part of the loss. That's what this court held in Trans-Texas. O'Quinn Firm has not pointed to any intervening case law that changes that result. They do talk about the Burks case, which was an intermediate court of appeals decision in Texas, but that case expressly said in a footnote that they weren't deciding whether or not disgorgement or restitution was insurable under Texas law. That case specifically dealt with a settlement that was made before there was a judgment entered in the case. And so what the court said in the Burks case was we're not going to, since the settlement may have gone to the restitutional remedies or it may have gone to other claims that were made in the lawsuit, we're not going to say that that settlement necessarily is uninsurable, and we don't read Nortex as precluding us from doing that. But the bottom line is this court is required to follow Trans-Texas. This court certainly should not hold that the district court erred in relying on this court's opinion in Trans-Texas case consideration. What provision of the insurance policy does protect you or keep you from identifying your coverage which says you cover wrongful acts including breach of fiduciary duty? Well, there are multiple, Your Honor, as you pointed out. One is the fact that it has to be— What provision of the policy overrides what your coverage provision says? Well, this is all within the coverage provision, Your Honor, and so it's not just a broad we cover any breach of fiduciary duty. The coverage provision has specific definitions and it has limiting language within the definition of loss. The rest of that provision? It's the entire provision dealing with the coverage issue, which is Part 1 of the— I struggle with this policy. Yes, Your Honor, and under the primary policy— I'm going to say no more. Under the primary policy, which of course the Lexington policy is a fall-in-form policy, the primary policy of national union sets forth the coverage, and the coverage says that it has to be a loss that arises from a claim, but that claim must be for a wrongful act in the rendition of professional legal services. So if the claim is not one for the rendition of professional— Okay, assuming you don't win on that, what else? Well, we win on the fact that the policy says, again, in the definition of loss, which is incorporated into the coverage section, loss does not include matters that are deemed uninsurable under the law. And assuming you don't win on that one? Assuming we don't win on that one, Your Honor, we move to Exclusion B, which is sort of the ill-gotten gain provision. Exclusion B, which applies to this entire claim, says the policy excludes coverage for any loss in connection with a claim arising out of, based upon, or attributable to, the gaining of any profit or advantage to which an insured was not legally entitled. And again, that's exactly what we have here. And that goes hand-in-hand again with the idea that restitutional-type claims are not insurable as a matter of law. We also have an Exclusion B, an exclusion that applies, which says basically the same thing. This is a claim that arises out of the Oakland law firm gaining an advantage. They took money that they were not entitled to. And again, there were findings from the arbitration panel that said that they used that money to pay down their general BI litigation expenses. There were expenses that they claimed that they conceded on the record were improper and should not have been taken at all. There were various things that they did. And ultimately, the arbitration panel concluded that the Oakland firm was gaining a profit and advantage to which they were not legally entitled. And so as a matter of law, Exclusion B applies. And that would not wipe out all of their claims in this case as well. And the Oakland firm has not shown any basis other than this new argument they have that somehow we're not supposed to rely upon any of the findings that the arbitration panel made when they themselves were relying upon them. They themselves were presenting those both to the district court and to this court in their briefing in this case. In addition, Your Honor, there's the definition of loss itself. It says that it does not include reimbursement of legal fees, costs, or expenses, which is exactly what we have in this case. The settlement that they made and the award on which that settlement was based and on which the Oakland firm says their settlement was based on the arbitration award was the reimbursement of expenses that they had improperly taken. It was the reimbursement of legal fees that they had improperly taken. That's what reimbursement means, and you have to use the common, ordinary usage of the term. The Oakland firm in their brief points out that there may be later policies that they've issued in which they talk about the return of or reimbursement for, but the fact that there's later language that sort of amplifies that doesn't change the meaning of the word reimbursement. What this case was about was about the reimbursement of legal fees and expenses, both the four. Can we shift gears for a minute? Yes. Let's assume we disagree with your argument about the defense cost, that it was raised in the district court and that it's before us. I'm just assuming. I'm not saying that we agree with that, but can you talk about defense costs? Certainly, Your Honor, and I think what kind of leads to the confusion or the uncertainty are two things. One is that there is a defined term in the policy of capital D, capital C defense costs, and that is incorporated within the definition of a loss. So, therefore, if there were to be a finding that Lexington had a duty to indemnify, then there would be an argument that defense costs, capital D, capital C, would be included within it. That's where they get the idea that, well, defense costs, as defined by the policy, includes post-judgment interest, and so, therefore, we're entitled to post-judgment interest as part of our defense costs under a duty to indemnify. The other thing to keep in mind is all the way through this case, right up to about a few months before the judge granted summary judgment, is that National Union, the primary insurer, was still in the case. They're the ones that have the duty to defend. Okay, they paid their policy limits $5 million. In January 2014. How much are their defense costs that exceed $5 million? We don't know the answer to that, Your Honor. There's nothing in the summary judgment record to suggest how much they claim that the defense costs either were exhausted or were not exhausted or how much is left or anything like that. The only thing we've heard about is this $5 million in post-judgment interest, which they only get to under the policy definition of capital D, capital C defense costs, and they only get to that if they can establish there is a breach of the duty to indemnify in this case, which means all the other arguments that we've made apply. When were the policy limits in the primary exceeded? As Oakwood Firm admits themselves, the earliest it could have been exhausted, the primary limits were exhausted, was when they settled in January 2017. That's expressly what they said. They filed a motion for leave to amend and file a first amendment complaint after the district court granted a summary judgment in which they made that argument. They said now the policy limits have been exhausted of the primary policy, so now we're going after Lexington because of the fact that now liability attaches and all these duties attach. Prior to that, prior to the district court's judgment, there was never an argument made. So the primary defended through the settlement, so we assume that defense costs were covered. I mean at least there were $5 million, but there's nothing in excess of that. Is that what you're saying? Well, again, we don't really know is the short answer to that. There's no evidence in the summary judgment record to suggest exactly how much. There is evidence, and we pointed out in our briefs, where there was testimony that was taken through depositions in this case as to the fact that there was about, I think it was about $3 million in actual legal fees, defense costs, that were at that point were due and owing, which the $5 million of national union coverage should presumably be sufficient to cover that without having to exhaust it entirely. But the short answer is we don't know that because there's no evidence of that within the summary judgment record. The argument that they're making is just this $5 million in post-judgment interest, which they're characterizing their own settlement to include post-judgment interest, but they don't get that post-judgment interest under any kind of breach of the duty to defend because they've never alleged a duty to defend, and there was no duty to defend by Lexington until after the primary limits would have been exhausted. And the policy just defines post-judgment interest as a category of capital D, capital C defense costs incorporated within the definition of loss. So therefore, that just is another category of damages that goes under the duty to indemnify. So the duty to defend argument is really just the reddest of herrings in this case because it all boils down to whether or not the policy covers the losses that they claim, and for various reasons it does not. Whichever path this court wishes to take to affirm the district court's judgment, the end result is the same. There is no coverage for this particular claim. There's no coverage for this alleged loss,  Thank you. Thank you. Conduct on behalf of a client? No, Your Honor. It is not so limited. Well, where do we get a definition giving effect to the language which says that the policies to cover a loss from any wrongful act committed by the insured in the rendering or failing to render professional legal services? Why does that mean acting as the profession for the client? Why is it limited to the right kind of professional service? I can't answer that question, Your Honor. I think based upon the plain language of the definition in this policy arising from and the professional legal services that include legal services and activities, when a professional is exercising judgment and that is alleged to be a wrongful act, then it should be covered. It should fall within that policy provision. I agree with you. I'm trying to test the limits of this here. So let's just say that you agreed that you would bill a specific rate, $500 an hour. The client pays it, and then they come back and say, you cheated us, you breached our duty, you actually billed more than that. And so the law firm says, sue me. And the client gets a judgment. Is that judgment, does the insurance company have to pay that judgment? I'm still, I know that I'm frustrating when I say that would be a very difficult question and it would be based on the policy language and the evidence. In your language, in this policy. In my language, I think that would be a close question. If it was just an accounting error. No, it wasn't an accounting error. They intentionally inflated the bills. They said, you know, we need, we want to bill a global amount here, so we're going to, instead of billing $500 an hour, we're going to make the bill, pad the bill, in essence, and get it up to a higher number. I think there would need to be a determination of what the language and activities means when you couple arising from. That's my problem with what they're arguing. They're trying to say, if it is a billing practice, if it has anything to do with a bill, then it is, as a matter of law, not covered under this policy. They have so many. I'm just asking you what is covered. What isn't covered, what is covered? I'm just saying, if they, you say, the law firm billed more than they should have. Unquestionably, it was intentional. It wasn't the accounting department. It was the partner and the associates padded the bill. The client sees. They recover that. Can the law firms, say, turn it over to the insurance company and say, hey, we got caught, you pay? I think if the law firm actually fraudulently billed what they knew they had not worked, that would be difficult to fit within this definition of arising from professional legal services because that would not, in my opinion, that would not constitute the exercise of professional judgment. I see that my time has expired. May I briefly conclude and make sure that this court knows we are not raising things for the first time on appeal. That's the most important thing that I wanted to alert the court. If you will look to page 11038 of the record, that is the time that Lexington tried to convince Judge Hoyt to apply a CVN standard, which was a collateral estoppel standard of review instead of a 56 standard. On 12811, we advanced the Puget standard of review, and then again in our brief on page 27, we explained that you cannot extrapolate these findings. You look at the entire record, and if you look at the entire record, then you know that we raised a fact issue on each of these, but when Judge Hoyt indulged presumptions in favor of an arbitration award that wasn't binding and that was ultimately vacated, he did not give us our rule 56. We've got your arguments on summary judgment. We'll take a careful look. Court is adjourned for the rest of the day.